[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 12 2001
THOMAS K. KAHN
CLERK

_____

No. 99-4410

_____

D. C. Docket No. A75-350-153

ANIBAL S. MAZARIEGOS,

Petitioner,

versus

OFFICE OF THE U.S. ATTORNEY GENERAL,
IMMIGRATION AND NATURALIZATION SERVICE,

Respondents.

_____

Petition for Review of an Order
of the Board of Immigration Appeals

_____

**(February 12, 2001)**

Before EDMONDSON and MARCUS, Circuit Judges, and RESTANI[*], Judge.

MARCUS, Circuit Judge:

---

[*]Honorable Jane A. Restani, Judge, U.S. Court of International Trade, sitting by designation.

This is a petition for review of a decision by the Board of Immigration Appeals ("BIA") of the Immigration and Naturalization Service ("INS"). Petitioner Anibal Mazariegos is a Guatemalan citizen who applied for asylum in the United States on the ground that he has a well-founded fear of persecution due to his political beliefs. Specifically, Mazariegos contends that he has been persecuted, and fears he will be again, by Guatemalan guerrillas who allegedly targeted him for his service in the Guatemalan army during that country's civil war. The BIA rejected Mazariegos's application, finding that he could not show that he was subject to persecution on account of his political opinions as opposed to merely his service in the army. The BIA also found that Mazariegos does not have a well-founded fear of persecution throughout the entire country of Guatemala. Because there is substantial evidence supporting the BIA's finding that Mazariegos does not face a threat of persecution country-wide, we reject his petition for review and affirm the BIA's decision.

I.

Mazariegos is a Guatemalan citizen who entered the United States on November 29, 1994 without formal admission or parole. There is no record evidence regarding his activities between November 1994 and April 1997. On April 18, 1997, Mazariegos applied to the INS for asylum and withholding of

2

removal, asserting that if he were returned to Guatemala he would be persecuted by guerrillas retaliating against him for his service in the Guatemalan army. The INS, in turn, initiated removal proceedings against Mazariegos on July 8, 1997.

At an evidentiary hearing before an Immigration Judge ("IJ"), Mazariegos testified that he served in the Guatemalan Armed Forces between 1989 and 1992 as a "soldier first class." The IJ described this position as a "low-level role," although Mazariegos said that he supervised two soldiers in the chain of command. Service in the Guatemalan military was obligatory. Mazariegos left the army after being honorably discharged in February 1992.

During his service, Mazariegos was in combat against guerrilla forces fighting the Guatemalan government as part of that country's 36-year civil war. Mazariegos testified that a month after his discharge "about six" men who he did not know, but recognized to be guerrillas from a group called Unidad Revolucionario Nacional Guatemala ("URNG"), forced entry into his parents' home in a rural area of Guatemala at a time when he was alone. The guerrillas were dressed in green uniforms and carried weapons. Mazariegos said that the men beat him, causing a laceration to his head requiring eleven stitches as well as a broken nose and fractures to both kneecaps. Mazariegos said that the guerrillas told him that he "had to leave, and they would give me an opportunity to leave

within a year and a half.  And, if I didn't do that they would not only kill me but they would kill my parents also."  Mazariegos also said that the guerrillas told him they were attacking him because he "had been involved in military service."  When asked by counsel why the guerrillas might have singled him out, Mazariegos said that he, presumably unlike others, "followed the orders that I was given by the officers in my zone."

Mazariegos said that he did not report this incident to the police.  Instead, he reported it to his former military commanders, who according to Mazariegos told him that they could not protect him because he was no longer in the commanders' zone.  Mazariegos said that some six months after the incident the guerrillas again came to his parents' house looking for him.  It appears that the guerrillas may have threatened him or his parents on one or more occasions.

Despite these threats, Mazariegos did not leave the area where the incident occurred.  Instead, he was able to avoid any further direct contact with the guerrillas by alternately staying at a friend's house and staying with his family.  Mazariegos testified that he believed the guerrillas would seek him out and kill him were he to return to Guatemala.  When asked why he never tried to relocate to a city or even another rural area in Guatemala, Mazariegos replied: "Well, it's that they, one way or another, are going to seek you out and find where you happen to

4

be." Mazariegos said that his father, who remains in Guatemala, wrote to him that the guerrillas "receive much of their strength from Chiapas [in southern Mexico] . . . he says that that's where they have the bulk of their strength from."

A February 1997 U.S. State Department report on human rights conditions in Guatemala during 1996, which was introduced into the administrative record, advised that "[p]eace talks between the Government and [URNG] resulted in a negotiated end of the 36 year long civil war, with a final peace accord signed in December. Guerrilla groups unilaterally ceased offensive actions in March [1996], and government forces immediately responded by halting counterinsurgency patrols." Notwithstanding the report, Mazariegos testified that he believed the peace accord was not for the group with which he had problems.

Based on the foregoing evidence, on October 10, 1997, the IJ denied Mazariegos's requests for asylum and withholding of removal, and granted the INS's request that Mazariegos be found removable to Guatemala. The IJ found that Mazariegos had failed to establish that he was a "refugee" within the meaning of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1101, et seq. Specifically, the IJ found that Mazariegos "really has not provided his native country an opportunity to protect him from this group." The IJ noted that Mazariegos failed to report his assault to the police, and did not attempt to relocate

5

to a more urban area "where he could seek the protection of the police." Thus, the IJ concluded that Mazariegos had failed to establish a well-founded fear of persecution because he offered "no evidence to indicate that the threat in this particular case exists against him countrywide other than his own statements." The IJ added that "[i]n light of [Mazariegos's] low-level role in the army the Court finds that it's not plausible to believe that the threat exists against him on a countrywide basis in Guatemala." The IJ also highlighted the State Department report, observing that it indicated a "final peace accord" in Guatemala as of December 1996 and hence "there is little likelihood of [Mazariegos] facing persecution if he were to return" to Guatemala.

Mazariegos appealed the denial of his asylum request to the BIA. In conjunction with his appeal, Mazariegos submitted "new evidence" consisting of proof that guerrillas killed his brother, Felix Mazariegos, in March 1998. Mazariegos describes that incident as a case of mistaken identity.

On February 24, 1999, the BIA unanimously rejected the appeal and affirmed the IJ's rulings. The BIA made two key determinations. Like the IJ, it found that Mazariegos had not shown that the alleged threat of persecution exists throughout Guatemala. It explained that "Mazariegos has not provided any convincing evidence to suggest that his fear of danger would exist throughout

6

Guatemala. In order to demonstrate a well-founded fear of persecution, an alien must demonstrate that the threat of persecution exists for him country-wide." The BIA also found that Mazariegos had not shown that he was persecuted on account of his "political opinion" or any of the other factors required by the INA to be eligible for asylum. The BIA explained that "an alien must do more than merely show that he was physically harmed or that his civil or human rights were violated; he must provide evidence that he was mistreated <u>because of</u> his political opinion, or one of the other grounds, rather than for some other reason." The BIA remarked that Mazariegos's request for asylum did not fail for lack of corroboration; it emphasized, however, that even "[a]ssuming the truth of his claim, it appears that the harm which [Mazariegos] fears from the guerrillas if he is returned to Guatemala is on account of his service in the military . . .. [Mazariegos] has failed to submit adequate evidence from which we could reasonably surmise that the guerrillas' interest in him relates to any of the enumerated grounds." In reaching these conclusions, the BIA took into account the new evidence submitted to it by Mazariegos.

Mazariegos timely requested review of the BIA's decision by this Court, and also moved this Court to stay the removal order. We granted the stay on May 7, 1999. There is no dispute about our jurisdiction to hear this appeal.

7

II.

The appropriate standard of review is well-settled. The BIA's factual determination that Mazariegos is removable and not entitled to asylum must be upheld if it is supported by substantial evidence. See, e.g., INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S. Ct. 812, 815, 117 L. Ed. 2d 38 (1992); Perlera-Escobar v. Executive Office for Immigration, 894 F.2d 1292, 1296 (11th Cir. 1990) (per curiam) ("[a] factual determination by the BIA that an alien is statutorily ineligible for asylum or withholding is reviewed under the substantial evidence test"); cf. 8 U.S.C. § 1252(b)(4)(B) (administrative findings of fact supporting order of removal "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). We have described the substantial evidence test as "deferential," and have emphasized we may not "re-weigh the evidence" from scratch. Lorisme v. INS, 129 F.3d 1441, 1444-45 (11th Cir. 1997). Thus, a denial of asylum may be reversed only if the evidence presented by the applicant is so powerful that a reasonable factfinder would have to conclude that the requisite fear of persecution exists. See Elias-Zacarias, 502 U.S. at 481 & n.1, 112 S. Ct. at 815 & n.1; Lorisme, 129 F.3d at 1445 (quoting Elias-Zacarias). To the extent the asylum decision is based on a particular interpretation of the INA, the BIA's legal

interpretation is subject to de novo review.  See, e.g., Perlera-Escobar, 894 F.2d at 1296.

Mazariegos does not disagree with application of the substantial evidence test.  He sometimes confuses the issue, however, by insisting that there is substantial evidence for findings contrary to those of the BIA.  That misses the point.  Our inquiry is whether there is substantial evidence for the findings made by the BIA, not whether there is substantial evidence for some other finding that could have been, but was not, made.  See, e.g., Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S. Ct. 1046, 1060, 117 L. Ed. 2d 239 (1992); Elias-Zacarias, 502 U.S. at 481 & n.1, 112 S. Ct. at 815 & n.1.

III.

The issue on appeal is whether the BIA erred by denying Mazariegos's requests for asylum and withholding of removal.  Mazariegos argues in essence that there is no substantial evidence for the BIA's finding that his persecution was not "on account of" his political opinion.  He also asserts that the BIA improperly held that his fear of persecution is not well-founded because it is not country-wide.  Because we conclude that Mazariegos was properly required to show, but did not show, that he faces a threat of persecution throughout Guatemala, we affirm the

9

BIA's decision on that basis, and do not address the BIA's alternative holding that Mazariegos's past persecution was not on account of political opinion.[1]

The INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum in accordance with this section . . .." 8 U.S.C. § 1158(a)(1). "The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." Id. § 1158(b)(1). The Attorney General is not required to grant asylum to everyone who meets the definition of "refugee." Instead, a finding that an alien is a refugee does no more than establish that the Attorney General may exercise her discretion to grant asylum. See INS v. Cardoza-Fonseca, 480 U.S. 421, 428 n.5, 107 S. Ct. 1207, 1211 n.5, 94 L. Ed. 2d 434 (1987); Lorisme, 129 F.3d at 1444. The term "refugee" means "any person who is outside any country of such person's

---

[1]Even assuming that Mazariegos could show that he suffered past persecution on account of political opinion or another of the enumerated factors, he still would not be eligible for asylum if he did not also have a well-founded fear of future persecution. The regulations, for example, provide that "[a]n application for asylum shall be denied if the applicant establishes past persecution [on the basis of one of the enumerated factors] . . . but it is also determined that he or she does not have a well-founded fear of future persecution . . .." 8 C.F.R. § 208.13(b)(1)(ii). It is with respect to the prospect of future persecution that the INS's country-wide requirement becomes an issue in this case.

nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).[2]

The BIA essentially determined that Mazariegos does not have the requisite well-founded fear of persecution because the alleged threat to him does not exist throughout all of Guatemala. Mazariegos asserts that the evidence establishes that he has a legitimate basis for fearing persecution everywhere in the country, not merely in the limited area where he used to live. Mazariegos also asserts, although solely in passing, that there is no statutory, constitutional, or international requirement that an asylum applicant demonstrate country-wide persecution.

---

[2]The parties agree that, in the event Mazariegos's asylum request fails, so too does his alternative request for withholding of removal. Withholding of removal to a country, unlike asylum, is a mandatory remedy. The alien must show, however, that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3). This language is almost identical to the former relief of withholding of deportation, which was construed as imposing a more stringent standard than the "well-founded fear" standard for asylum. See, e.g., Cardoza-Fonseca, 480 U.S. at 431, 107 S. Ct. at 1212. Thus, we explained that "[i]f an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of deportation." Nkacoang v. INS, 83 F.3d 353, 355 (11th Cir. 1996). Mazariegos makes no separate argument regarding his request for withholding of removal.

The statute does not expressly require that asylum seekers face a threat of persecution throughout their entire country of origin as opposed to a particular place within that country. Nor do the INS's regulations express such a requirement. In a series of administrative decisions, however, the BIA construed the statute and regulations to require that an asylum applicant face a threat of persecution country-wide. See, e.g., Matter of Acosta, Interim Dec. 2986, 19 I. & N. Dec. 211, 235 (BIA 1985) ("[A]n alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place or abode within a country -- he must show that the threat of persecution exists for him country-wide."), modified on other grounds, Matter of Mogharrabi, Interim Dec. 3028, 19 I. & N. Dec. 439 (BIA 1987). In Acosta, the BIA explained its reasoning this way:

> Traditionally, a refugee has been an individual in whose case the bonds of trust, loyalty, protection, and assistance existing between a citizen and his country have been broken and have been replaced by the relation of an oppressor to a victim. Thus, inherent in refugee status is the concept that an individual requires international protection because his country of origin or of habitual residence is no longer safe for him. We consider this concept to be expressed, in part, by the requirement in the [INA] and the [United Nations Protocol Relating to the Status of Refugees] that a refugee must be unable or unwilling to return to a particular "country." We construe this requirement to mean that an alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place or abode within a country -- he must show that the threat of persecution exists for him country-wide.

12

19 I. & N. Dec. at 235-36 (citations omitted).

In Matter of R, Interim Dec. 3195, 20 I. & N. Dec. 621 (1992), the BIA

further elaborated on its reasoning, rejecting an asylum application because the

applicant failed to demonstrate that the alleged persecution existed on a

country-wide basis:

> To establish eligibility for relief under section 208(a) of the
> Act, an alien must be unable or unwilling to return to his country of
> nationality or the country in which he last resided because of
> persecution or a well-founded fear of persecution on account of race,
> religion, nationality, membership in a particular social group, or
> political opinion. . . . [T]he Office of the United Nations High
> Commissioner for Refugees, Handbook on Procedures and Criteria for
> Determining Refugee Status . . . provides:
>> "As long as [an applicant] has no fear in relation to the
>> country of his nationality, he can be expected to avail
>> himself of that country's protection. He is not in need of
>> international protection and is therefore not a refugee."
>
> We have construed this requirement "to mean that an alien
> [must show a country-wide threat. (citing Acosta)]." The published
> cases which have dealt with this issue have involved claims of
> nongovernmental persecution. While the issue will ordinarily arise in
> these circumstances, it is not limited to such situations. The issue
> similarly can arise where governmental authorities or those with ties
> to the government cannot be adequately controlled in one particular
> area of a country, but individuals can live safely elsewhere in their
> country of nationality. The [UN] Handbook states:
>
>> "The fear of being persecuted need not always extend to
>> the whole territory of the refugee's country of nationality.
>> Thus in ethnic clashes or in cases of grave disturbances
>> involving civil war conditions, persecution of a specific
>> ethnic or national group may occur in only one part of the

13

country. In such situations, a person will not be excluded from refugee status merely because he could have sought refuge in another part of the same country, if under all the circumstances it would not have been reasonable to expect him to do so."

This language reflects the concept that, while it is not "always" necessary to demonstrate a country-wide fear, it is the exception, rather than the rule, that one can qualify as a refugee without such a showing.

Id. at 625-26 (citations omitted).

The BIA has applied a country-wide requirement consistently in its decisions. See, e.g., In re C-A-L, Interim Dec. 3305 (BIA 1997); Matter of R; Matter of Fuentes, Interim Dec. 3065, 19 I. & N. Dec. 658, 663 (BIA 1988); Matter of Acosta. Although this Court has never addressed the validity of the country-wide requirement, courts elsewhere have followed the BIA by applying a country-wide requirement in asylum cases. See Etugh v. INS, 921 F.2d 36, 39 (3d Cir. 1990) (no prima facie case for asylum where applicant "failed to allege that he would be persecuted beyond the limited vicinity of his hometown. . . . The scope of persecution [he] alleges is not national . . .."); Cuadras v. INS, 910 F.2d 567, 571 n.2 (9th Cir. 1990) (noting that the possibility of internal relocation may be considered in determining well-founded fear of persecution); Quintanilla-Ticas v. INS, 783 F.2d 955, 957 (9th Cir. 1986) (rejecting asylum claim for aliens who could avoid geographically-localized danger by settling in a different part of the

14

country because "[e]ven if [aliens] would face some danger in their home town . . . deportation to [their country of origin] does not require [them] to return to the area of the country where they formerly lived").[3]

On the record of the present case, and in the absence of meaningful argument on this point by Mazariegos, we conclude that the BIA did not err by interpreting the INA and the regulations to require that Mazariegos, an alien seeking asylum on the basis of non-governmental persecution, face a threat of persecution country-wide.[4] The statute itself and the regulations speak consistently

---

[3]Mazariegos cites no case law for his objection to the country-wide requirement. We recognize that some Ninth Circuit decisions have rejected the country-wide requirement in cases where the asylum seeker produced evidence of past persecution. See, e.g., Singh v. Ilchert, 69 F.3d 375, 379-80 (9th Cir. 1995). Those decisions, however, appear to be limited to instances of past persecution by the foreign government rather than persecution by a guerrilla group or other non-governmental force. See, e.g., Singh v. Moschorak, 53 F.3d 1031, 1034 (9th Cir. 1995) ("We have recognized that where there was a danger of persecution in a single village from guerrillas who knew the petitioner, and no showing of such danger elsewhere in the country, the petitioner failed to establish eligibility for asylum"). The Fifth Circuit, although expressly declining to adopt or reject the Ninth Circuit's view of the BIA's country-wide requirement, has deviated from the BIA's approach slightly by ruling that where the foreign government is the alleged persecutor, the INS rather than asylum seeker bears the burden of showing that no threat exists country-wide. Abdel-Masieh v. INS, 73 F.3d 579, 587 (5th Cir. 1996). We express no view regarding these decisions, which are inapposite here because Mazariegos alleges solely non-governmental persecution.

[4]Under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), where Congress in a statute has not spoken unambiguously on an issue, the interpretation of the statute by an agency entitled to administer it is entitled to deference so long as it is reasonable. Chevron deference may be applied to agency interpretations arrived at through formal adjudication. See Gonzales v. Reno, 212 F.3d 1338, 1348-49 (11th Cir.), reh'g denied, 215 F.3d 1243, cert. denied, -- U.S. --, 120 S. Ct. 2737, 147 L. Ed. 2d 1001 (2000); see also Cardoza-Fonseca, 480 U.S. at 448, 107 S. Ct. at 1221 ("There is obviously some ambiguity to a term like 'well-founded fear' which can only be given meaning through a process of case-by-case adjudication. In that process of filling 'any gap left, implicitly

15

in terms of the geopolitical unit "country."[5] Moreover, where the alleged persecutors are not affiliated with the government, it is not unreasonable to require a refugee who has an internal resettlement alternative in his own country to pursue that option before seeking permanent resettlement in the United States, or at least to establish that such an option is unavailable. As a matter of immigration policy, a government may expect that an asylum seeker be unable to obtain protection anywhere in his own country before he seeks the protection of another country. We therefore uphold the BIA's imposition of a country-wide requirement in this case.

As to the factual issue -- whether there is substantial evidence for the BIA's finding that Mazariegos does not face a threat of persecution throughout Guatemala -- the INS also prevails. There is ample evidence supporting the

---

or explicitly by Congress,' the court must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program."). An agency's interpretation of its own regulations is also entitled to great deference. See Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 801, 13 L. Ed. 2d 616 (1965); McKee v. Sullivan, 903 F.2d 1436, 1438 n.3 (11th Cir. 1990). The degree of deference is especially great in the field of immigration. See, e.g., Gonzales, 212 F.3d at 1349 n.12.

[5]The basic definitional statute defines a refugee in terms of a person "who is outside the country of such person's nationality." 8 U.S.C. § 1101(a)(42)(A). The regulations as to establishing refugee status refer to persecution "in his or her country of nationality" and unwillingness to return to "that country," 8 C.F.R. § 208.13(b)(1); changed "conditions in the applicant's country of nationality," id. § 208.13(b)(1)(i); and compelling reasons not to return to "his country of nationality," id. § 208.13(b)(1)(ii); see also id. § 208.13(b)(2) (containing similar references).

16

conclusion that the threat of persecution to Mazariegos is limited to one area of Guatemala, if it still exists anywhere in the country. First, Mazariegos has never had any direct contact with the guerrillas except for the single incident that occurred in his parents' home -- an incident that occurred over eight years ago. Second, Mazariegos lived unharmed for over two-and-one-half years in the specific area where the incident occurred, without any further contact with the guerrillas. Third, Mazariegos was a fairly low-level solider who does not appear to have played any especially notorious role in the war. We cannot say on this record that he is a high-profile target, or that guerrillas outside the vicinity of his home are likely to identify and pursue him.

Fourth, Mazariegos himself testified that his father told him that the bulk of the guerrillas' strength was actually outside Guatemala, in the Chiapas region of Mexico. Fifth, Mazariegos has never contacted the local police or national law enforcement authorities to obtain protection from the guerrillas, and therefore cannot argue persuasively that the Guatemalan government is unable or unwilling to protect him. Finally, according to the U.S. State Department, the civil war has long since been resolved, and the Guatemalan government signed a peace accord in

1996 (after Mazariegos fled the country) with the specific rebel group that Mazariegos says attacked him in 1992.[6]

Mazariegos does not rebut any of these facts, except to offer testimony, without support, that the individual guerrillas who attacked him may not have signed any peace accords. He highlights selected portions of the February 1997 State Department report indicating that during 1996 guerrillas occupied various towns throughout the country to disseminate political propaganda and assembled captive audiences to listen to propaganda. These excerpts from the report do not establish that the guerrillas engaged in warfare throughout the country, let alone that they did so even after the final peace accord in December of that year or have continued to do so to this day. Although the report certainly identifies serious acts of violence and terrorism by participants in the civil war, the INA "does not extend eligibility for asylum to anyone who fears the general danger that inevitably

---

[6]We observe that in an analogous case, <u>Matter of C-A-L</u>, Interim Dec. 3305 (BIA 1997), the BIA invoked the country-wide requirement to reject the asylum application of a former Guatemalan army solider who alleged a well-founded fear of persecution by Guatemalan guerrillas. Relying on the State Department report for Guatemala, the BIA found that the guerrillas were concentrated in specific areas, and observed that "given the poor infrastructure of the various guerrilla groups, most low-profile victims of localized harassment by the guerrillas can relocate away from the area where they experienced problems, instead of seeking asylum in a foreign country." The BIA also emphasized that the applicant was a low-level solider and that his problems were confined to the area of his home town.

18

accompanies political ferment and factional strife." Huaman-Cornelio v. Board of Immigration Appeals, 979 F.2d 995, 1000 (4th Cir. 1992).

Mazariegos also points out that Guatemala is a relatively small country, and suggests that the guerrillas therefore have the capability of persecuting him anywhere in the country. He further contends that the killing of his brother in 1998 demonstrates that the civil war is not over, at least insofar as it concerns him. But this evidence falls short of undermining the persuasive facts supporting the BIA's finding that Mazariegos does not presently face a threat of persecution throughout Guatemala. Simply put, Mazariegos's argument that the guerrillas who assaulted him eight years ago operate throughout the entirety of Guatemala and are poised to attack him again wherever he may go in that country is not backed by specific proof in the record and is presented at too high a level of abstraction.

On this record, there is substantial evidence supporting the BIA's determination that Mazariegos does not face a threat of persecution country-wide, as well as its implicit determination that there is at least a reasonable prospect that Mazariegos can safely resettle within Guatemala. Indeed, in light of the peace accord, Mazariegos on this record arguably no longer faces a threat of persecution anywhere in Guatemala. See Lorisme, 129 F.3d at 1446 (asylum applicant lacked well-founded fear of future persecution in Haiti where new government was in the

19

midst of disarming rural militant groups); <u>Fleurinor v. INS</u>, 585 F.2d 129, 134 (5th Cir. 1978) (applicant lacked well-founded fear of impending persecution in Haiti where his arrest for participating in an invasion attempt occurred eight years earlier and there was "no basis for believing that the Haitian government has any interest in him today, eight years after the supposed arrest").

In short, while we do not question the genuineness of Mazariegos's concern about returning to his home country, we are not persuaded that he is entitled to relief on this record. Accordingly, Mazariegos's petition for review is denied, and the BIA's order is affirmed in full.

PETITION FOR REVIEW DENIED.